## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  19-CR-30034-SMY |
| | ) | |
| EUGENE FALLS, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S TRIAL MEMORANDUM

Now comes, The United States of America, by Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and through Amanda M. Fischer, Assistant United States Attorney, who provides the Court with the Government's Trial Brief.

## I.   SUMMARY OF ANTICIPATED FACTS:

Defendant Eugene Falls is charged by way of a second superseding indictment with Attempted Possession with Intent to Distribute a Controlled Substance: Methamphetamine (Count 1); Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances: Methamphetamine, Heroin, Cocaine, and Cocaine Base (Count 2); Distribution of a Controlled Substance: Heroin (Count 3); and Money Laundering Conspiracy (Count 11).

Beginning in about December 2018, Eugene Falls began receiving methamphetamine and heroin from a drug trafficking organization based in Colorado.  He had been in prison with co-defendant Manuel Gonzalez-Sarabia and upon their release from custody, Gonzalez-Sarabia began distributing the drugs to

Falls for further distribution in the Southern District of Illinois, consisting of a total of two separate distributions. Co-defendant Jonathan Cerillo-Martinez assisted Gonzalez-Sarabia with these deliveries by acting as an intermediary with couriers and by acting as a courier himself. The organization brought Falls two separate deliveries of ten pounds of ice methamphetamine, along with a delivery of one kilogram of heroin.

During the second delivery in January 2019, DEA agents began conducting surveillance on several individuals associated with the Colorado drug trafficking organization while they were located in this district. They observed those individuals at the residence of Eugene Falls. Ultimately, agents arrested Cerillo-Martinez with over $12,000 of drug proceeds in his vehicle. Cerillo-Martinez subsequently admitted to his role in this conspiracy and that he had received the approximately $12,000 from Falls as payment for a drug debt.

Around the same time, DEA agents were also investigating co-defendant Laverrance West and his drug distribution activities in the Southern District of Illinois. Using a confidential source, agents conducted three separate controlled buys of heroin from West. Agents also received judicial authorization for a Title III wiretap of West's phone. While intercepting those calls, agents intercepted communications with Eugene Falls in which Falls and West discussed drug transactions and types and amounts of various drugs.

On February 22, 2019, agents used a confidential source to purchase one ounce of heroin from Falls in an audio and video recorded transaction. Before the

2

transaction took place, Falls called West on the intercepted line and asked West to "put 24 [grams] together."

On March 8, 2019, agents conducted a reverse buy operation with Falls, in which they used a confidential source who purported to have methamphetamine that Falls could purchase. In the days leading up to that transaction, the confidential source posed as a member of the same Colorado drug trafficking organization and discussed the amount of money already owed by Falls and the potential for future transactions. Specifically, Falls and the confidential source agreed that Falls would purchase 10 pounds of ice methamphetamine for a total of $28,000, and that he would bring a down payment of $10,000. Falls did meet with the confidential source as planned and brought $10,015 with him as payment. The meeting was audio and video recorded, and Falls discussed his prior dealings with the drug trafficking organization in detail.

After the confidential source counted the money, agents arrested Falls at the scene. He was advised of his *Miranda* rights and subsequently gave an audio-recorded statement, admitting that he had been meeting with the confidential source to purchase ten pounds of methamphetamine and that the approximately $10,000 on his person was payment for those drugs. He also admitted to receiving ten pounds of methamphetamine and one kilogram of heroin in December 2018, and nine pounds of methamphetamine in January 2019. Falls paid some of that debt in cash and some of it through the transfer of vehicles. Falls also admitted using acquaintances to send money via Walmart money transfers to names that were provided to him by Cerillo-

Martinez to further pay his debt.

On March 20, 2019, West was arrested.  Agents searched his house pursuant to a warrant and located a gun, heroin, cocaine base, and cocaine, among other items. He admitted that he had been selling cocaine, heroin, and marijuana from his residence for several years.  He also stated that the heroin he had been selling was given to him by Falls, who got it from an unknown Hispanic source of supply.  West also admitted that he received most of the cocaine and crack cocaine that he sold from Falls.  On March 8, 2019, West gave $5,000 cash to Falls, for Falls to use as part of his $10,000 down payment to buy methamphetamine from an unknown Hispanic source of supply.  In exchange for that $5,000 contribution, Falls planned to repay West with cocaine.

## II.   LEGAL ISSUES:

### A.  Elements of the Crimes

#### 1.  Attempt Possession with Intent to Distribute a Controlled Substance

Defendant is charged in Count 1 with attempted possession with intent to distribute a controlled substance, methamphetamine in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(viii).  Conviction on such a charge requires proof that: 1) the defendant intended to possess a controlled substance and intended to distribute it to another person; 2) the defendant believed the substance was some kind of controlled substance; and 3) the defendant knowingly took a substantial step toward possessing a substance he  believed to be a controlled substance, intending to possess it.  Seventh Circuit Pattern Crim. Jury Instr. 4.01,

21 U.S.C. § 846. The government is not required to prove that the defendant knew the substance was actually a controlled substance. *Id*.

The attempt charge in this case is based on a "reverse buy" operation by DEA, using a confidential informant. This is an accepted investigative technique "where the government attempts to sell a controlled substance rather than buy it." *United States v. Cea*, 963 F.2d 1027, 1028 n.1 (7th Cir. 1992). In this type of operation, it is not necessary for the Government to prove that any actual drugs existed to form the basis of that charge. "To the contrary, the government regularly secures convictions for attempted possession without actually having proffered to the defendant real cocaine." *United States v. Garcia*, 89 F.3d 362, 366 (7th Cir. 1996). In such a case, the question for the jury is "whether [the defendant] believed that he actually was buying [a controlled substance]," in this case, methamphetamine. *Id*.

## 2. Conspiracy to Distribute or Possess with Intent to Distribute Controlled Substances

In Count 2, defendant is charged with conspiracy to distribute and possess with intent to distribute controlled substances, namely methamphetamine, heroin, cocaine, and cocaine base, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(A)(i), and 841(b)(1)(C). The essential elements of the charged conspiracy are: 1) the conspiracy as charged in count 2 existed; and 2) the defendant knowingly became a member of the conspiracy with intent to advance the conspiracy. Seventh Circuit Pattern Crim. Jury Instr. 4.01, 5.08(B). It is important to note that neither drug type nor drug quantity is an element of a drug conspiracy offense. *See, e.g.*, *United States v. Dixon*, 527 F.App'x. 524, 527 (7th Cir.

5

2013) ("[D]rug quantity is not an element of an offense under either § 841 or § 846.");
*Horton v. United States*, 244 F.3d 546, 552 (7th Cir. 2001) ("[T]he type of drug is *not* an element of the offense."). However, to the extent that mandatory minimum sentences apply to this defendant's conduct, such amounts must be found by a jury, as described further below.

### 3. Distribution of a Controlled Substance

Defendant is charged in Count 3 with distribution of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). The essential elements of a heroin distribution charge are: 1) the defendant knowingly distributed heroin; and 2) the defendant knew the substance was some kind of a controlled substance. Seventh Circuit Pattern Crim. Jury Instr. 4.01, 21 U.S.C. § 841(a)(1). The government is not required to prove that the defendant knew that the substance was heroin. *Id*.

### 4. Enhanced Sentencing Factors

If the jury finds the defendant guilty of Counts 1, 2, or 3, they must then answer additional questions regarding the quantity of drugs involved for purposes of determining whether the defendant is subject to a mandatory minimum sentence (as to Counts 1 and 2), and regarding the defendant's prior criminal conviction (as to Counts 1, 2, and 3). Those additional questions are described in the Government's proposed jury instructions and contemplate the use of a special verdict form as to each count and each issue.

Pursuant to Title 21, United States Code, Section 841(b)(1)(A)(viii), the defendant is subject to a mandatory minimum sentence as to Count 1 if the jury finds that the amount of mixture or substance containing a detectable amount of methamphetamine involved in the attempt was 500 grams or more. Alternatively, the jury could find that the government only proved that the amount was 50 grams or more, triggering a 5-year mandatory minimum sentence pursuant to Section 841(b)(1)(B)(viii). Likewise, as to Count 2, the defendant is subject to a mandatory minimum sentence of 10 years if the jury returns a special verdict form finding that the total amount of methamphetamine involved in the conspiracy was 500 grams or more, pursuant to Section 841(b)(1)(A)(viii), or that the total amount of heroin involved in the conspiracy was 1 kilogram or more, pursuant to Section 841(b)(1)(A)(i). If the jury finds that the conspiracy involves the lesser amounts of 50 grams or more of methamphetamine, pursuant to Section 841(b)(1)(B)(viii), or 100 grams or more of heroin, pursuant to Section 841(b)(1)(B)(i), then the defendant is subject to a mandatory minimum sentence of 5 years. Of course, if the jury finds the defendant guilty but also finds that the government did not prove that the offenses involved the aforementioned amounts of methamphetamine and/or heroin, the defendant remains guilty of the conspiracy but is not subject to a mandatory minimum sentence.

The government also alleged in the second superseding indictment and through a Notice of Enhanced Sentencing that the defendant is subject to enhanced sentencing provisions as a result of his prior drug offense conviction. Specifically, as

to Counts 1 and 2, the defendant is subject to a mandatory minimum sentence of 15 years if the jury finds (1) that the offense involved the requisite amount of drugs alleged in the indictment, and (2) that the defendant committed these offenses after a prior conviction for a "serious drug felony." 21 U.S.C. § 841(b)(1)(A). The term "serious drug felony" includes an offense under the Controlled Substances Act for which a maximum term of imprisonment of 10 years or more is prescribed by law, for which the defendant served a term of imprisonment of more than 12 months and his release from imprisonment was within 15 years of the commencement of the instant offense. 21 U.S.C. § 802(57). In this case, that prior offense is alleged to be the defendant's conviction for Conspiracy to Distribute and Possess with the Intent to Distribute Heroin and Cocaine Base, in case number 05-CR-30027-DRH in the Southern District of Illinois.

As to Count 3, the defendant is subject to a maximum sentence of 20 years if the jury finds that the defendant committed the offense after a prior conviction for a "felony drug offense." 21 U.S.C. § 841(b)(1)(C). This is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs . . . ." 21 U.S.C. § 802(44). This prior is based on the same prior offense as alleged above.

In this matter, the defendant has not stipulated to the fact of his prior conviction. As such, the United States must prove these additional elements beyond a reasonable doubt to the jury in order to establish that the defendant is subject to

enhanced sentencing.  The Government intends to present evidence in the form of a certified copy of defendant's prior conviction; business records from the Bureau of Prisons regarding the time served by the defendant in that facility and his release date; and testimony from United States Probation Officer Christian Hoepker, identifying Falls as the person whom she was supervising on that prior offense and establishing his release date based on the commencement of his supervised release term.

### 5.    Money Laundering Conspiracy

In Count 11, defendant is charged with money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h).  The essential elements of the charged money laundering conspiracy are: 1) the conspiracy to commit a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) existed; and 2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.  Seventh Circuit Pattern Crim. Jury Instr. 4.01, 5.08(B).  The elements of a violation of Section 1956(a)(1)(B)(i) are: 1) the defendant knowingly conducted or attempted to conduct a financial transaction; 2) some or all of the property involved in the financial transaction was proceeds of distribution of controlled substances; 3) the defendant knew that the property involved in the financial transaction represented proceeds of some form of unlawful activity; and 4) the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of distribution of

controlled substances. Seventh Circuit Pattern Crim. Jury Instr. 4.01; 18 U.S.C. § 1956(a)(1)(B)(i).

In order to prove the defendant guilty of money laundering conspiracy, the Government need not prove any specific overt act in furtherance of the conspiracy. *Whitfield v. United States*, 543 U.S. 209, 214 (2005). In this case, the Government will present evidence in support of a theory that the defendant conspired with co-defendant Cerillo-Martinez and others to conceal the nature and ownership of drug proceeds. In support of this conspiracy, the defendant used other individuals to send wire transfers of drug proceeds to other, unrelated individuals, who would transfer the money to members of the drug trafficking organization including Cerillo-Martinez. In doing so, the transactions were designed to conceal the true fact that the defendant was repaying a drug debt to Cerillo-Martinez and other co-conspirators, using drug proceeds.

### 6. Forfeiture Allegation

The second superseding indictment includes a forfeiture allegation as to $10,015 United States currency. The Government will present evidence that this property consists of the money taken off of the defendant's person at the time of the reverse operation resulting in the charge contained in Count 1 of the second superseding indictment.

Under *Libretti v. U.S.*, 516 U.S. 29, 116 S.Ct. 356 (1995), forfeiture is part of sentencing, and there is no constitutional right to a jury trial. Neither *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000) nor *United States v. Booker*, 543 U.S.

10

220, 125 S.Ct. 738 (2005) provide a defendant with a constitutional right to a jury determination on forfeiture issues, according to *U.S. v. Tedder*, 403 F.3d 836, 840-842 (7th Cir. 2005)). Therefore, the defendant's right to a jury on forfeiture issues is limited to only what was granted to him by Congress in Rule 32.2 of the Federal Rules of Criminal Procedure.

Rule 32.2 provides a right to a jury in criminal forfeiture cases under certain circumstances. Rule 32.2(b)(1)(A) states: "Forfeiture determinations. As soon as practicable after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. . . ." Thus, forfeiture jury trials are in fact bifurcated, as the judge or the jury does not determine the forfeiture until the original guilty verdict has been returned.

Rule 32.2(b)(1)(B) provides: "Evidence and Hearing. The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Therefore, the forfeiture verdict can be based on evidence raised in the case-in-chief.

Rule 32.2(b)(5)(A) states: "Retaining the Jury. In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." The default finder of fact on all of the forfeiture issues is the judge, and the jury considers the nexus between property and the offense only upon a party's request. Therefore, unless the defendant (or the government) affirmatively asks for the jury on the forfeiture issue, the judge will make that determination. If the defendant waits until the jury goes home before he requests it for the forfeiture portion of the trial, he has waived the right to a jury—even if he filed a general jury demand at the time of arraignment. *United States v. Davis*, 177 F.Supp. 470 (E.D. Va. 2001).

Finally, Rule 32.2(b)(5)(B) provides: "Special Verdict Form. If a party timely requests to have the jury determine forfeiture, the government must submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant." The burden of proof for the forfeiture portion is preponderance of the evidence. *United States v. Vera*, 278 F.3d 672 (7th Cir. 2002). The judge, not the jury, orders property to be forfeited. The jury merely makes a finding that the facts exist to support the forfeiture, such as the property was used to facilitate the offense or constitutes proceeds of the offense.

The theory of forfeiture in this case derives from Title 21, United States Code, Section 853. It applies to "[a]ny person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year." 21 U.S.C. § 853(a).

12

In that event, he must forfeit "any of [his] property used, or intended to be used, in any matter or part, to commit, or to facilitate the commission of, such a violation." 21 U.S.C. § 853(a)(2). In this case, the Government intends to produce evidence that the currency for which forfeiture is sought was money that the defendant brought with him to a meeting that he believed was a drug transaction, and it was meant to serve as a down payment for methamphetamine. Therefore, because the money was intended to be used to commit the attempted drug transaction charged in Count 1, this property would properly be subject to forfeiture upon the jury's finding of guilt as to Count 1, followed by a special verdict or judicial finding that forfeiture is appropriate based on the facts presented.

## B. Evidentiary Issues

### 1. Admission of Recorded Calls and Transactions

At trial, the United States will seek to admit certain one-party consensual audio and/or video recordings of telephone calls and in-person meetings between confidential informants and Eugene Falls. The recordings that the United States will seek to admit are admissible without the testimony of the confidential informants. The United States intends to establish foundation for the recordings and offer them into evidence through the testimony of a law enforcement witness. For each recorded conversation, a law enforcement witness will testify that the recording is a true and accurate depiction of each conversation. This conclusion will be based on the fact that the agent listened to the recorded conversations contemporaneously, that the recording devices reliably produce accurate results, and that the agent can readily identify the participants in the conversation.

At trial in this case, the United States will seek to admit through a law enforcement witness several consensually recorded phone calls between a confidential informant and Eugene Falls, one of which occurred on February 22, 2019, and the others which took place between March 4 and March 8, 2019. The United States will also seek to introduce audio and/or video recordings of consensually recorded in-person meetings between confidential informants and Eugene Falls on February 22, 2019 and March 8, 2019. The content of these recorded conversations include statements made by the defendants and the confidential sources. But only the statements made by the defendants will be offered by the United States for the truth of the matters asserted.

For the consensually recorded telephone conversations on February 22, 2019, agents used a recording device to record the calls as they took place, while listening simultaneously. All of the recorded calls on that date occurred in the presence of agents. For the consensually recorded telephone conversations referenced above that occurred between March 4 and March 8, 2019, agents were able to obtain these recordings using technology created by "Callyo." At trial, a law enforcement witness will explain that the confidential source was provided with a phone number to use, and that the Callyo technology recorded the calls for that phone number. The Callyo technology also allows law enforcement agents to listen to these recorded calls live or at a later time. A law enforcement witness in this case will testify that he listened live to all of the consensually recorded telephone conversations referenced above. The law enforcement witness will also testify—based on his experience—that the Callyo

technology reliably produces accurate results.

Likewise, for the consensually recorded in-person meetings referenced above, a law enforcement witness will testify that the recording devices were provided to the confidential sources prior to the recorded meetings, and the law enforcement witness will also testify that the recording devices were subsequently retrieved from the confidential sources after the recorded meetings.  In addition, a law enforcement witness will also testify that he listened live to the consensually recorded in-person conversations referenced above, and he will also testify that he can identify the speakers who participated in these conversations.  Furthermore, a law enforcement witness will testify that the recording devices used for the in-person recorded conversations reliably produce accurate results, and also that the recording devices cannot be turned on or off (or be altered in any way) by the confidential sources without detection by the supervising agents.  A law enforcement witness will also testify that the recording devices used for the in-person recorded conversations referenced above were not turned on or off (or altered in any way) by the confidential sources in this case. In sum, a law enforcement witness will testify that the in-person consensually recorded conversations referenced above are true and accurate recordings of the conversations that took place on February 22, 2019 and March 8, 2019, with Eugene Falls.

The United States Court of Appeals for the Seventh Circuit has consistently upheld the admission of recordings through law enforcement witnesses like those to be offered by the United States here. *See generally United States v. Gaytan*, 649 F.3d

573 (7th Cir. 2011); *United States v. Eberhart*, 467 F.3d 659 (7th Cir. 2006); *United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006); *United States v. Westmoreland*, 312 F.3d 302, 310 (7th Cir. 2002). Under binding precedent, the above-referenced recordings can be authenticated by a law enforcement witness.

The Federal Rules of Evidence provide that "[t]he requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). To meet this burden, "the government [must] show by clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties." *Eberhart*, 467 F.3d at 667. The Seventh Circuit has further explained that "[d]istrict courts are given wide latitude to determine whether the government has met its burden." *Id.*

Applying this standard, the Seventh Circuit has consistently upheld the admission of recordings as authentic where, as here, a law enforcement witness testifies that he listened to the recorded conversation live, that the recordings were not altered or edited, and that he can identify the participants of the conversation. That was the precise holding in *United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002), where the agents testified that "he was present when the calls were made, that he had listened in on headphones, and that the tapes were 'first generation copies' of the tapes made that night." *Id.* at 310 (quotations in original). Based on that testimony, the Seventh Circuit held that "[t]he Government clearly submitted sufficient evidence to meet its burden here." *Id. See also Eberhart*, 467 F.3d at 667

("Agent Foley testified that he listened to [the confidential source's] half of the [recorded] conversations as they occurred and that the recordings accurately portrayed what [the confidential source] said during those conversations. He also testified that he recognized the second voice on the recordings as [the defendant's]. Though Agent Foley did not listen to [the defendant's] half of the conversations as they occurred, his testimony sufficiently established the tapes' authenticity."); *Tolliver*, 454 F.3d at 666 n.4 ("[The detective] supervised each controlled purchase and its recording and further reviewed each recording one-on-one with [the confidential source] . . . [The detective] testified that each tape was a true and accurate recording of each conversation and also that he was familiar with [the recorded] voices. As such, the government adequately authenticated each tape.").

Based on this precedent, the United States will properly authenticate the above-referenced recordings through a law enforcement witness. Indeed, a law enforcement witness will testify that he listened live to each of the recorded conversations to be offered by the United States. In addition, a law enforcement witness will also testify that he can identify the participants in each recorded conversation, and also that the recordings were not edited or altered. This testimony will adequately authenticate each recording offered by the United States.[1]

## 2.   Recorded Statements by Confidential Sources are Not Hearsay

---

[1] Because resolution of this issue will greatly affect the length of trial, order and number of witnesses, and presentation of evidence, the United States contemporaneously requests leave to file a motion for a pre-trial order allowing admission of those recordings. This would allow for the defendant to respond to this issue, should he wish to do so, in advance of trial, as opposed to addressing any evidentiary objections that may come up in the middle of trial.

Furthermore, the admission of the recordings without testimony from confidential sources does not abridge defendant's rights. The Seventh Circuit has consistently held that admitting recorded conversations through a law enforcement witness—and not a confidential source—does not violate the Confrontation Clause in the Sixth Amendment.

In *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the United States introduced recordings of two controlled buys of crack cocaine conducted by a confidential source through the testimony of law enforcement agents without calling the confidential source. *Id.* at 576. On appeal, Gaytan unsuccessfully argued that the recorded statements of the non-testifying confidential source were testimonial hearsay and that their admission violated the Sixth Amendment's Confrontation Clause. *Id.* at 578-79.

Rejecting this argument, the Seventh Circuit recognized that "[a]dmitting a witness's out-of-court testimonial statements when that witness is available to testify violates the accused's Sixth Amendment right of confrontation, **but not when those statements are offered for a purpose 'other than establishing the truth of the matter asserted**.'" *Id.* at 579 (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n. 9 (2004)) (emphasis added). The Seventh Circuit added the following:

> The Confrontation Clause only comes into play where "the defendant ma[kes] a showing that the [g]overnment offered the declarant's statements for the truth of the matter asserted." *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir.2007). As we have explained, a confidential informant's out-of-court statements are not hearsay if they are offered not for the truth but to put the defendant's statements in context or to make what he said and did in reaction to the informant's statements intelligible to the jury.

*Id.* at 579-80.

The specific exchange that was challenged as inadmissible hearsay by the defendant in *Gaytan* included the following:

> **[CI]:** *... My brother just came with some dude who's tr-, trying to get two ounces of rock....*
>
> **Gaytan:** What you need? ...
>
> **[CI]:** *I'm trying to get, f—ing um, a couple O's of rock, man.*
>
> **Gaytan:** Where the loot at? ...
>
> **[CI]:** How much do I need, for each ounce? ...
>
> **Gaytan:** I'll give it to you, I'll give it to you for six bills, dog.

*Id.* at 579. While Mr. Gaytan claimed that the italicized statements made by the confidential informant were offered by the United States for their truth—in violation of Federal Rule of Evidence 801—the Seventh Circuit disagreed. *Id.* at 580. According to the Seventh Circuit, "the government offered the challenged statements not for their truth but to put Gaytan's own words in context and to help the jury make sense out of his reaction to what Worthen said and did." *Id.* Indeed, "[t]hese statements were not being offered to show that some "dude" with Gaytan's brother *actually* wanted to buy two ounces of "rock"; the statements were offered to show their effect on the listener, Gaytan." *Id.* Much like the statements by confidential informants included above in this case, the confidential informant's statements in *Gaytan* "were offered to put Gaytan's response in context—to show he understood [the CI] was looking for crack and responded accordingly." *Id. See United States v. York*, 572 F.3d

415, 427 (7th Cir. 2009) (informant's statement "Just bring me nine" was admissible to place defendant's response "You want me to cook it?" in context).  *See also United States v. Foster*, 701 F.3d 1142, 1150-54 (7th Cir. 2012) (recorded statements of non-testifying confidential source were offered "not for their truth, but to put [the defendant's] own words in context and to help the jury make sense out of his reaction to what [the confidential source] said and did."); *United States v. Van Sach*, 458 F.3d 694 (7th Cir. 2006); *United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006); *United States v. Bermea-Boone*, 563 F.3d 621 (7th Cir. 2009).

Applying this precedent here, the admission of recorded statements made by confidential sources does not run afoul of the Confrontation Clause because those statements are not being offered for their literal truth. Instead, any recorded statements made by the confidential sources in this case merely "put [the defendants'] own words in context and . . . help the jury make sense of [the defendants'] reaction to what [the confidential informants] said and did." *Gaytan,* 649 F.3d at 580.

### 3.  Admission of Wire Calls

At trial, the Government expects to present evidence in the form of intercepted telephone calls between the defendant and co-defendant Laverrance West, pursuant to a judicially authorized Title III wiretap.  The Government can properly lay a foundation for the admissibility of recordings in two ways: "a chain of custody could establish that the tapes are in the same condition as when recorded, or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence." *United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998).  As to the chain

of custody, "'a presumption that a system of regularity accompanied the handling of evidence [attaches] if the exhibits are at all times within official custody. Furthermore, the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility.'" *Id.* (citations omitted). These same principles apply whether the recordings are the original, sealed copies, or duplicate copies prepared for trial. *See id.*; *see also* Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate.").

In this case, a Special Agent with the DEA can testify that he obtained a court order authorizing the Title III wiretap in this case.   Pursuant to that order, interceptions of co-defendant Laverrance West's phone began in the wire room located in St. Louis, within the Eastern District of Missouri.  As those calls were intercepted, they were recorded to secure servers within the wire room.  Additionally, as the calls were intercepted and logged by monitoring agents, the Special Agent could review recordings of those calls immediately after their conclusion.  Once the wiretap concluded, those recordings were downloaded off of the secure server, and the same Special Agent retrieved those recordings from the secure server room.  They were held in DEA custody until sealed with the District Court, and they remained in secure evidence after that time.  Additional copies were also provided as working copies for the case agents and to the United States Attorney's Office, from which trial exhibits were prepared.  The Special Agent will also testify that upon reviewing those exhibits,

the calls are accurate recordings of the intercepted calls that he reviewed immediately after their interception. Thus, the United States will establish a proper chain of custody for these wire calls sufficient to permit their admission into evidence.

Alternatively, the recordings may be authenticated through "other testimony" to "establish the accuracy and trustworthiness of the evidence." *Rivera*, 153 F.3d at 812. This may be established through "the recollections of eyewitnesses to those events," including testimony from a participant to the conversation that the recordings accurately depict the conversations that occurred. *United States v. Carrasco*, 887 F.2d 794, 803 (7th Cir. 1989). Therefore, should a participant to those wire conversations testify that they accurately depict the conversations that occurred with the defendant, that testimony is also sufficient, on its own, as proper foundation for admission of these intercepted calls into evidence.

### 3. Admissibility of Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The admission of a coconspirator statement against a defendant is proper where the United States establishes by a preponderance of evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of that particular conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Haynie*, 179 F. 3d 1048, 1050 (7th Cir. 1999); *United States v. Lindemann*, 85 F.3d 1232, 1238

22

(7th Cir. 1996); *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978).

### a.   Membership in and Existence of the Conspiracy.

A district court should consider the coconspirator statements in determining both the existence of a conspiracy and a defendant's participation in it.  *Bourjaily*, 483 U.S. at 180; Fed. R. Evid. 801(d)(2)(E).  Indeed, the admissibility of conspirators' declarations "is not contingent on demonstrating by non-hearsay evidence either the conspiracy or a given defendant's participation." *United States v. Martinez de Ortiz*, 907 F. 2d 629, 634 (7th Cir. 1990) (en banc).  However, the contents of the proffered coconspirator statements "are not alone sufficient" to establish the existence of a conspiracy and a defendant's participation in it. Fed. R. Evid. 801(d)(2)(E).  Instead, "[t]he Court must consider in addition [to the coconspirator statements themselves] the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or the evidence corroborating the contents of the statement. . . ."  Fed. R. Evid. 801, advisory committee's notes (1997 Amendment).

The evidence showing a defendant's membership in a conspiracy may be either direct or circumstantial.  *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000); *United States v. Patterson*, 213 F. Supp. 2d 900, 910-11 (N.D. Ill. 2002).  Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

A defendant joins a conspiracy if he agrees with a conspirator to one or more of the common criminal objectives set forth in the indictment; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Boucher*, 796 F.2d at 975; *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); s*ee also Rodriguez*, 975 F.2d at 411 (explaining that the defendant must have intended to join and associate himself with the conspiracy's criminal design and purpose). Indeed, the United States need not prove that a defendant or coconspirator knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985).

A defendant or coconspirator may be found to have participated in a conspiracy even if he joined the conspiracy or terminated his relationship with core conspirators at a different time than another defendant. *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985). In fact, "[s]tatements made in furtherance of a conspiracy are admissible against members of the conspiracy who join after the statements were made, provided the conspiracy was in existence when they were made." *United States v. Harris*, 729 F.2d 441, 448 (7th Cir. 1984) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 393 (1947)).

A district court may consider the conduct, knowledge, and statements of the defendant and others in establishing participation in a conspiracy. A single act or conversation, for example, can "suffice to connect the defendant to the conspiracy if

that act leads to the reasonable inference of intent to participate in an unlawful enterprise." *United States v. Baskes*, 687 F.2d 165, 169 (7th Cir. 1981). "[S]tatements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern." *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987). A conspirator who has become inactive in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987); *see also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).[2]

## b. Statements Made in Furtherance of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals. *See Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987); *see also United States v. Mackey*, 571 F.2d 376, 383 (7th Cir. 1978). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception. *See Shoffner*, 826 F.2d at 628.

---

[2]     A defendant, even if not an "agreeing" member of a conspiracy or joint venture, may nonetheless be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy. *See United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir. 1985); *United States v. Galiffa*, 734 F.2d 306, 309-11 (7th Cir. 1984). There is no requirement that the indictment charge him with aiding and abetting in order for this principle to apply. *See Kasvin*, 757 F.2d at 890.

Given the United States's "relatively low burden of proof on this issue," *Shoffner*, 826 F.2d at 628, the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *See, e.g., United States v. Herrero*, 893 F.2d 1512, 1527-28 (7th Cir. 1990); *Garlington v. O'Leary*, 879 F.2d 277, 283-84 (7th Cir. 1989). In general, a statement which is "part of the information flow between conspirators intended to help each perform a role" is admissible under Rule 801(d)(2)(E). *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994) (quoting *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991)). These include statements made: (1) to identify other members of the conspiracy and their roles, *see United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); *United States v. Roldan-Zaoata,* 916 F.2d 795, 803 (2d Cir. 1990); (2) to recruit potential coconspirators, *see Shoffner*, 826 F.2d at 628; (3) to control damage to an ongoing conspiracy, *see United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988); (4) to keep coconspirators advised as to the progress of the conspiracy, *see Potts*, 840 F.2d at 371; (5) to conceal the criminal objectives of the conspiracy, *see United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); (6) to plan or to review a coconspirator's exploits, *see United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a coconspirator can be trusted to perform his role, *see United States v. Buishas*, 791 F.2d 1310, 1315

(7th Cir. 1986).[3]

### 4.   Transcripts of Recorded Calls and Transactions

The Government intends to present various audio and video recordings as evidence in its case in chief, all of which have been disclosed to the defendant in discovery.  The Government has also prepared written transcripts of those recordings to aid the jury, some of which may appear at the bottom of the screen simultaneously with the playing of the clip, and some that will be presented to the jury in hard copy— or presented through the evidence monitors—as the clips play.  In analyzing the admissibility of recordings and transcripts, "the district court . . . bears an obligation to make sure in the first instance that the tape recording is, within reason, intelligible." *United States v. Howard*, 80 F.3d 1194, 1198 (7th Cir. 1996).  Upon a determination that the recording itself is admissible, the district court may consider the issue of written transcripts.  "When objections are raised to the accuracy of any transcript that is supplied to the jury, the preferred procedure is for the judge to conduct a hearing and assess the accuracy of the transcript." *Id.* at 1199.  In such a hearing, the following procedure should occur:

> Initially, the district court and the parties should make an effort to produce an "official" or "stipulated" transcript, one which satisfies all sides.  If such an "official" transcript cannot be produced, then each side

---

[3]      No separate Sixth Amendment confrontation issues are posed at trial by the use of a non-testifying defendant coconspirator's statements, which are offered for their truth against another defendant.  This is because "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause." *Bourjaily*, 483 U.S. at 182.  Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met." *Id.*  As a result, in weighing the admissibility of proffered coconspirator statements, the trial court should not consider whether or not the coconspirator-declarant is "unavailable." *United States v. Inadi*, 475 U.S. 387, 400 (1986).  A court also need not engage in an independent inquiry into the "reliability" of the proffered statements. *Bourjaily*, 483 U.S. at 183-84.

should produce its own version of the disputed portions.  In addition,
each side may put on evidence supporting the accuracy of its version or
challenging the accuracy of the other side's version.

*Id.* (citation and internal quotation marks omitted).   The Government is
contemporaneously providing its proposed transcripts along with this filing to the
defendant for his review.

"The decision to permit the use of written transcripts of tape-recorded
conversations is committed to the sound discretion of the district court."  *United
States v. Camargo*, 908 F.2d 179, 183 (7th Cir. 1990).  In the event that transcripts
are allowed, "[t]he jury should be instructed that it is the tape recording itself which
is the primary evidence, that the transcript is to assist the jury in evaluating the
primary evidence, and that if the jury determines that the transcript is in any respect
incorrect, it should disregard it to that extent and rely on its own interpretation of
the recording."  *United States v. Nunez*, 532 F.3d 645, 651 (7th Cir. 2008).  The
Government has included the Seventh Circuit Pattern Jury instruction addressing
this issue in its proposed jury instructions.  Finally, the Seventh Circuit "repeatedly
has approved the practice of sending transcripts to the jury room" during
deliberations.  *Camargo*, 908 F.2d at 183.

Respectfully submitted,

UNITED STATES OF AMERICA,

STEVEN D. WEINHOEFT
United States Attorney

*s/ Amanda M. Fischer*
AMANDA M. FISCHER
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail: amanda.fischer@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **March 25, 2021**, I electronically filed the following document: **GOVERNMENT'S TRIAL MEMORANDUM** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney of record:

Paul E. Sims, blast357@gmail.com

and I hereby certify that I have hand-delivered the document to the following non-CM/ECF participants:

Eugene Falls
Williamson County Sheriff's Office
404 N. Van Buren Street
Marion, IL 62959

Respectfully submitted,

THE UNITED STATES OF AMERICA

STEVEN D. WEINHOEFT
United States Attorney

*s/ Amanda M. Fischer*
AMANDA M. FISCHER
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Phone: (618) 628-3700
E-mail: amanda.fischer@usdoj.gov